# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Marlin Laursen,

Civ. No. 09-163 (DWF/JJK)

        Plaintiff,

v.

Michael J. Astrue, Commissioner of the
Social Security Administration,

**REPORT AND
RECOMMENDATION**

        Defendant.

---

Jennifer G. Mrozik, Esq., Hoglund, Chwialkowski & Mrozik, PLLC, counsel for
Plaintiff.

Lonnie F. Bryan, Esq., Assistant United States Attorney, counsel for Defendant.

---

Pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), Plaintiff Marlin Laursen

seeks judicial review of the final decision of the Commissioner of Social Security

(the "Commissioner"), who denied Plaintiff's applications for disability insurance

benefits and supplemental security income.  This matter has been referred to this

Court for a report and recommendation on the parties' cross-motions for

summary judgment.  *See* 28 U.S.C. 636; D. Minn. Loc. R. 72.1.  For the reasons

stated below, the Court recommends that Plaintiff's Motion for Summary

Judgment (Doc. No. 8), be denied and Defendant's Motion for Summary

Judgment (Doc. No. 11), be granted.

# BACKGROUND

## I.    Procedural History

Plaintiff filed an application for disability insurance benefits and

supplemental security income on March 12, 2001, alleging a disability onset date

of April 9, 2000.  (Tr. 85-87.)[1]  Plaintiff filed a protective application on March 29,

2004 (Tr. 88), and another application for disability insurance benefits on May 10,

2004, again alleging a disability onset date of April 9, 2001.  (Tr. 89-91.)  The

Social Security Administration ("SSA") denied Plaintiff's applications initially

(Tr. 69-73, 79-83), and again upon receipt of his requests for reconsideration.

(Tr. 65-68, 74-77.)  Plaintiff timely requested a hearing before an Administrative

Law Judge ("ALJ"), on June 20, 2005.  (Tr. 64.)  On January 30, 2007, the ALJ

conducted a hearing (Tr. 776-802), and on March 25, 2007, the ALJ issued an

unfavorable decision on Plaintiff's applications.  (Tr. 18-33.)  Plaintiff sought

review of the ALJ's decision, and on November 20, 2008, the Appeals Council

denied Plaintiff's request for review.  (Tr. 8-13.)  This denial of review made the

ALJ's March 25, 2007 decision the final decision of the Commissioner.  *See* 20

C.F.R. §§ 404.981, 416.1481.

On January 26, 2009, Plaintiff filed this action seeking judicial review of the

Commissioner's decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).  On

---

[1]     Throughout this Report and Recommendation, this Court cites to the administrative transcript filed in this case (Doc. No. 7), by using the abbreviation "Tr."

April 13, 2009, Defendant filed an Answer along with a certified copy of the Administrative Record (Doc. Nos. 6, 7), and the parties thereafter filed cross-motions for summary judgment as provided in District of Minnesota Local Rule 7.2. (Doc. Nos. 8, 11.)

## II. Factual Background and Medical History

Plaintiff was born on November 16, 1958. (Tr. 89, 778.) At the time of the ALJ's decision, he was 48 years old. He graduated from high school and later earned a two-year degree in electronics. (Tr. 779.) Plaintiff has performed past relevant work as a data-systems technician in the U.S. Navy, as a carpenter, and as a flooring installer and finisher. (Tr. 113.) Plaintiff alleges that he has a disability resulting from injuries sustained in an accident in which he fell from a ladder on April 9, 2000. (Tr. 112.) Plaintiff's injuries included a broken left wrist, a shattered right wrist, and a torn rotator cuff in his right shoulder. (*Id.*) In a Disability Report, Plaintiff stated that these injuries leave him unable to perform basic functions of life without chronic pain and that he has nerve damage in his right hand. (*Id.*) He further stated that he has chronic stiffness in his right hand, pain in his right hand and wrist, limited range of motion in his right arm, and severe pain in his right shoulder when reaching in certain directions. (Tr. 119.) In a later Disability Report, Plaintiff alleged that he injured his left shoulder in a fall in February 2004, that he had lost low-frequency hearing in his right ear and hears a constant ringing in his left ear, that he suffers nausea, dizziness, balance, and coordination problems, that he has lower-back pain, knee pain,

neck pain, that he has difficulty breathing, and that he suffers from depression. (Tr. 173.)

In the April 9, 2000 accident, Plaintiff suffered a six-foot fall from a ladder onto a gravel surface with his wrists extended. (Tr. 234.) As a result, he sustained "bilateral distal fractures with almost complete displacement of distal comminuted fragment on the right [wrist]." (*Id.*) His right wrist showed an obvious distal dorsal deformity. (*Id.*) He also injured his right shoulder in the accident. (Tr. 439.)

Defendant saw Dr. Jeffrey D. Ley for a consultation regarding this injury on April 10, 2000. (Tr. 237.) At that time, Dr. Ley informed Plaintiff that "his right wrist is a severe injury and these are fraught with complications and that they are bad fractures and bad fractures have bad outcomes." (*Id.*) Dr. Ley further explained to Plaintiff that he would have arthritis, that he will never have full range of motion and function of the hand, and that the goal would be to restore as much function as possible and attempt to heal the fracture. (*Id.*) Dr. Ley noted, however, that with internal fixation through bone grafting or an external fixator, the right fracture could be "reduced and held out to length." (*Id.*) That same day, April 10, 200, Dr. Ley performed surgery on Plaintiff's left and right wrists. Dr. Ley placed two pins in the distal radius in the left wrist and placed it in a cast. Dr. Ley opted to use an external fixator to repair the right wrist after bringing the fracture out to length and reducing it anatomically. Dr. Ley placed

4

four pins in Plaintiff's right wrist, and applied an "AG external fixator . . . with traction and volar tilt."  (Tr. 239.)

Plaintiff followed up repeatedly with Dr. Ley in the months after the surgery.  (Tr. 442-48.)  For example, on May 25, 2000, Dr. Ley noted that Plaintiff's right wrist revealed no changes in the external-fixation device that Dr. Ley had previously applied and that the positioning and alignment in Plaintiff's left wrist were unchanged and consolidation was evident at the fracture site. (Tr. 444.)  Dr. Ley removed the external-fixation device from Plaintiff's wrist by the time Plaintiff followed up with Dr. Ley on June 22, 2000.  (Tr. 442.)  Plaintiff again followed up with Dr. Ley on July 31, 2000, and Dr. Ley noted that Plaintiff had "made some good gains in [range of motion and] strength."  (Tr. 339.)  At that time, Plaintiff needed to continue strengthening and increasing range of motion, especially in his thumb and forearm.  (*Id.*)  Plaintiff also had a follow-up visit with Dr. Ley on September 6, 2000, regarding his recovery from his wrist surgeries.  (Tr. 337.)  Dr. Ley noted that at that time, Plaintiff had made "nice gains in all areas" but continued to have problems with pain.  (Tr. 337.)

In September 2000, Plaintiff saw Dr. Ley for pain he experienced in his right shoulder following the ladder accident.  (Tr. 439-41.)  Dr. Ley found that Plaintiff's rotator cuff was normal, but that his symptoms were "highly suspicious for a SLAP lesion."  (Tr. 439.)  Plaintiff had a surgical repair of the SLAP lesion on September 25, 2000.  (Tr. 435.)

In March 2001, Plaintiff reported that he had experienced hearing loss in his right ear since his childhood. (Tr. 248.) On March 22, 2001, Plaintiff saw Dr. Susan Weber for an audiogram that showed normal hearing in his left ear and moderate hearing loss in the right ear with high-frequency sounds. (*Id.*) Dr. Weber noted that Plaintiff's left-speech threshold was normal, but could not establish such a threshold for his right ear. (*Id.*)

On April 15, 2001, and September 22, 2001, Drs. Erik Ekstrom and Jacelyn Kawiecki, assessed Plaintiff's residual functional capacity ("RFC"). (Tr. 255-62.) Their assessment indicated that despite Plaintiff's physical impairments, he could occasionally lift up to 20 pounds, frequently lift up to 10 pounds, stand and/or walk with normal breaks for up to 6 hours in an 8-hour workday, sit with normal breaks for about 6 hours in an 8-hour workday, and push and/or pull with limitations in his upper extremities. (Tr. 256.) The assessment indicated that Plaintiff should avoid regular overhead lifting and reaching with his right arm, as well as frequent power grasping, vigorous pushing and pulling, and use of heavy tools bilaterally. (Tr. 258.) Drs. Ekstrom and Kawiecki based their conclusions on Plaintiff's wrist surgeries, SLAP legion and shoulder surgery, and improvements in his wrist functionality, range of motion, and decreased pain. (Tr. 256.) Their assessment noted no establishment of postural limitations, visual limitations, communicative limitations, or environmental limitations. (Tr. 257-59.) It also noted that Plaintiff's allegations of pain were "partially credible." (Tr. 260.)

6

On August 29, 2001, Dr. Ward R. Jankus, conducted a consultative examination of Plaintiff relating to Plaintiff's disability claims. (Tr. 250-53.) Plaintiff reported pain in several areas, including deep right-wrist pain while resting or with any movement, and numbness in his right wrist. (Tr. 250.) Plaintiff reported some left-wrist pain as well, but to a lesser extent. (*Id.*) He reported occasional swelling and redness in the joints of the index, middle, and pinky fingers. (*Id.*) Plaintiff also mentioned to Dr. Jankus that he had experienced problems with his shoulder since his April 9, 2000 ladder accident, that he had arthroscopic repair of the SLAP lesion in his shoulder, and that the surgery helped increase his range of motion, but failed to alleviate the pain. As a result, Plaintiff told Dr. Jankus that he avoids pushing and pulling and overhead activities. (*Id.*) Plaintiff indicated that he could lift and carry no more than five pounds using his arms together with most of the exertion concentrated on the left arm. (*Id.*) He reported difficulty tying shoes, buttoning, and writing. (Tr. 250-51.) He stated that he had experienced knee problems for over 10 years, that the problems increased in the 4 months prior to Dr. Jankus's consultation, but at that time, Plaintiff had no X-rays of his knees. (Tr. 251.) Finally, Plaintiff mentioned experiencing some pain in his right ankle due to recurrent sprains and lumbar stiffness in the morning without any sciatica complaints. (*Id.*) After physically examining Plaintiff, Dr. Jankus noted that:

> [Plaintiff] has some irregularity and deformity at the right wrist and has decreased range of motion at the right wrist. Both hands are slightly cool compared to average, particularly the right hand

although no skin sweat pattern changes or hair loss or fingernail changes appreciated.  His finger range of motion reveals some mild generalized stiffness at both hands but no significant limitations at any of the finger joints except the right fifth digit.  . . .  There is tenderness with manipulation around the right wrist region with stiffness appreciated.  There is some atrophy of the mid forearm musculature on the right compared to the left, but the upper forearm musculature only measures 1 cm. smaller on the right compared to the left.  . . . He describes pin prick as a bit diminished throughout the right hand compared to the left.

(Tr. 251-52.)  Dr. Jankus reported that Plaintiff's range of motion in his back was essentially full at this examination August 29, 2001, that Plaintiff had full range of motion in his knees, that he walked without a limp and had no difficulty sitting, and that he had some mild drooping of the right shoulder and shoulder pain with movement.  (Tr. 252.)

Dr. Jankus concluded that Plaintiff "may well be developing some early degenerative arthritis [in his knees] although the exam [was] nonfocal" and ordered two X-rays of the knees and the right ankle.  (Tr. 253.)  However, Dr. Jankus stated that the "major issues" were really Plaintiff's wrists and hands, particularly his right wrist.  Regarding the left wrist, Dr. Jankus was unsure of the cause of numbness Plaintiff claimed to be experiencing.  With respect to the right wrist, Dr. Jankus concluded that Plaintiff "does have definite restriction at the right wrist range of motion in all directions and has difficulty using the hand for pinching and gripping[.]"  (*Id.*)  Dr. Jankus recommended that Plaintiff's lifting and carrying tolerance would "reasonably . . . be limited in the range of 5 to 10

pounds with the understanding that most of that would be held on the left and the

right used more to stabilize the object." (*Id.*)  Finally, he concluded that

> [Plaintiff] is not going to be able to tolerate prolonged forceful
> gripping and pinching at the right hand and probably to some extent
> at the left as well.  At the right shoulder he still has some persistent
> limits in range of motion and does have documented abnormality on
> previous MRI and surgical report.  He is not going to be able to do
> pushing and pulling at the right upper extremity or overhead
> activities on the right to any extent either.  Basic light grasping and
> manipulating are still intact for day to day self care type activities but
> those activities do take him longer with the right hand in particularly
> [sic], and he may well have difficulty keeping up in any type of rapid
> assembly type activities using the right hand.

(*Id.*)

On October 13, 2001,[2]  Plaintiff saw Dr. Peter B. Jarvis in Urgent Care and

reported that someone had recently punched him from behind in his right

shoulder causing increased pain.  (Tr. 398.)  Plaintiff reported pain with any

attempt to lift his right arm and that he was concerned that the shoulder was

coming out of socket when he reached with his right arm.  (*Id.*)  Dr. Jarvis noted

that Plaintiff had a "slight[ly] diminished right trapezius muscle compared to the

left, although he [said] he is right handed and is unable to use his right arm" as

often as he had before.  (*Id.*)  Dr. Jarvis also observed that Plaintiff could actively

---

[2]     Two days later, on October 15, 2001, Dr. Charles T. Grant completed a
RFC assessment for Plaintiff's allegations of hearing loss.  (Tr. 265-72.)
Dr. Grant noted that Plaintiff "has profound hearing loss on the right.  His hearing
is normal in the left ear, but he would have some difficulty locating sounds
because of his monoaural hearing."  (Tr. 269.)  However, Dr. Grant did not
recommend any limitations on Plaintiff's RFC as a result of these findings.

move his right arm behind his back but that he did not have full range of motion. (*Id.*)  Dr. Jarvis concluded that Plaintiff suffered a "right shoulder sprain, rotator cuff injury versus old trauma" and suggested that Plaintiff follow-up with Dr. Ley. (*Id.*)

On October 31, 2001, Plaintiff followed up with Dr. Ley regarding the recent reinjury to his shoulder.  (Tr. 396.)  Plaintiff reported the same symptoms to Dr. Ley that he had reported to Dr. Jarvis two weeks earlier.  (*Id.*)  Dr. Ley observed that Plaintiff had some palpable tenderness in various areas of the joint, that his pulse in the area was intact, and that there were no neurological problems in the area. (*Id.*)  Dr. Ley concluded that Plaintiff suffered "[r]ight shoulder impingement pain; possibly due to shoulder instability."  (*Id.*)  Plaintiff also had full range of motion in his cervical spine and lower extremities.  (*Id.*) Dr. Ley injected "1 cc of Aristopan and 1 cc of lidocaine . . . into the subacromial space [and Plaintiff's] impingement pain improved considerably."  (*Id.*)  Finally, Dr. Ley set an appointment to follow-up with Plaintiff in six weeks after a full strengthening program, at which time he would evaluate whether further imaging studies should be undertaken.  (Tr. 396.)

Plaintiff saw Dr. Ley on January 9, 2002, again complaining of shoulder pain.  (Tr. 395.)  Dr. Ley observed that Plaintiff presented a "[h]igh clinical suspicion of recurrent labral tear following trauma; SLAP lesion."  (*Id.*)  Dr. Ley ordered an MRI of Plaintiff's right shoulder and intended to contact Plaintiff with

the results.  (*Id.*)[3]  On October 29, 2003, Plaintiff again saw Dr. Ley for an

evaluation of his right-shoulder pain.  (Tr. 279.)  Plaintiff denied that any specific

injury had occurred in the interim, but reported increased pain in the time leading

up to the October 29 meeting.  (*Id.*)  Dr. Ley observed marked weakness in the

shoulder with certain movements and decreased range of motion, as well as

"positive impingement sign with exquisite tenderness."  (*Id.*)  Dr. Ley concluded

that Plaintiff presented a "[h]igh clinical suspicion for rotator cuff tear" and sent

Plaintiff for an MRI of the right shoulder.  (*Id.*)  The MRI showed that Plaintiff had

a "full thickness large rotator cuff tear [and] retraction of that rotator cuff tear."

(Tr. 278.)  Plaintiff also had a tear in his subscapularis tendon.  (*Id.*)  Dr. Ley

recommended "open right rotator cuff repair with repair of the subscapularis

tendon as well."  (*Id.*)  On November 14, 2003, Dr. Ley performed the surgery,

and noted that "[t]he prognosis is good."  (Tr. 385.)

After this surgery, on January 28, 2004, Plaintiff reported to Nurse

Practitioner Sheryl Schulte that he felt miserable and was experiencing joint pain

throughout his body.  (Tr. 277.)  Plaintiff demonstrated some decreased range of

---

[3]    In March 2003, Plaintiff saw Dr. Todd Lindquist for evaluation of his
hearing loss.  (Tr. 390-91.)  Plaintiff reported that his left ear had been "feeling
plugged" and that he had been experiencing dizziness and nausea.  (*Id.*)
Plaintiff's examination showed that he had more sinus drainage and productive
sputum from bronchitis than from any ear infection.  (*Id.*)  Dr. Lindquist concluded
that Plaintiff had "[l]eft mild conductive loss with improving eustachian tube
dysfunction[, and] unilateral asymmetric sensorineural loss."  (Tr. 391.)
Dr. Lindquist discussed ear protection and taking noise precautions with Plaintiff.
(Tr. 391.)

motion in his right shoulder.  (*Id.*)  Nurse Schulte concluded that Plaintiff had

"[b]ilateral carpal tunnel syndrome [and] right rotator cuff tear, and painful joints

and swelling."  (*Id.*)  On February 10, 2004, Dr. Ley performed surgery on Plaintiff

for release of the carpal tunnel syndrome without complications.  (Tr. 378.)

On March 10, 2004, Dr. Nancy L. Meryhew saw Plaintiff for a

rheumatology consultation because Plaintiff was reporting chronic pain in both

hands, left-shoulder pain, knee and ankle pain, and neck and lower-back

stiffness.  (Tr. 375.)  Plaintiff also reported fatigue due to non-restorative sleep,

and gastrointestinal issues.  (Tr. 376.)  Dr. Meryhew questioned whether

Plaintiff's symptoms could be due to fibromyalgia, but noted that Plaintiff did not

complain of "diffuse arthralgias and myalgias and [did] not have any areas of

trigger-point tenderness on examination[.]"  (Tr. 377.)  Dr. Meryhew also

concluded that Plaintiff suffered "post traumatic degenerative arthritis contributing

to his current right hand pain."  (*Id.*)  Dr. Maryhew ordered bilateral-hand X-rays,

which "revealed mild degenerative arthritis of the left 1st MCP joint with moderate

degenerative disease involving the right radiocarpal joint," and bilateral-knee and

ankle X-rays, which were "unremarkable."  (Tr. 374.)

On April 2, 2004, Plaintiff saw Dr. Julie Van Eck for a follow-up from his

rheumatology consultation; he complained of numbness in his hands and feet,

and a burning sensation in his knees and ankles.  (Tr. 372.)  Plaintiff also

reported pressure in his left ear, and was worried that he might be experiencing

hearing loss in that ear as well.  (*Id.*)  Dr. Van Eck diagnosed "[b]ilateral extremity

paresthesias" and left-ear tinnitus. (*Id.*) To rule out any "demyelinating disease," Dr. Van Eck recommended an MRI of Plaintiff's head and that he see someone in neurology. (*Id.*)

On May 12, 2004, Plaintiff saw Dr. Thomas Jacques for a neurological consultation based on Dr. Van Eck's referral. (Tr. 280-87.) Dr. Jacques examined Plaintiff and noted that he appeared "to be stiff and tender at the joints to any type of movement [and that] [h]e complain[ed] of pain from the feet all the way to the shoulders." (Tr. 286.) Dr. Jacques concluded that Plaintiff suffered from arthritic complications. (Tr. 281, 286.) Dr. Jacques ordered an electromyogrpahy examination ("EMG"), of Plaintiff's lower extremities and his right hand to determine whether Plaintiff had any form of neuropathy. (Tr. 286.) The EMG revealed "evidence of a residual right median neuropathy at the wrist with no evidence of a sensory motor polyneuropathy or plyradiculoneuropathy." (Tr. 284.) Dr. Jacques therefore concluded that he "did not find any neurologic cause [for Plaintiff's] specific pains." (Tr. 281.)

Later in May 2004, Plaintiff saw Dr. Van Eck again complaining of low-back pain, hand pain and numbness, and right-ear tinnitus and pressure. (Tr. 370.) Plaintiff reported worsening of chronic low-back pain over the months preceding his visit along with left-side numbness. (*Id.*) On examination, Dr. Van Eck observed that Plaintiff had "very poor range of motion at the waist and [was] unable to go more than a few degrees of extension, a little bit flexion but not much more." (*Id.*) Dr. Van Eck prescribed a Medrol dose pack for Plaintiff's

back, noted that she was not certain what was causing the pain and numbness in Plaintiff's hands and that he should follow-up with another doctor, and that he had right tinnitus with pressure and left-hearing loss for which he ought to follow-up with a specialist.  (*Id.*)

On June 22, 2004, Plaintiff sought a second opinion regarding left-sided tinnitus and aural fullness from Dr. Samuel Levine at an ear, nose, and throat clinic.  (Tr. 304-05.)  Plaintiff reported that he had experienced tinnitus in his left ear for some time and described "dysequilibrium when turning his head side to side that only lasts for a few seconds and then resolves."  (Tr. 304.)  Dr. Levine conducted an audiogram that showed profound hearing loss on the right, and on the left, Plaintiff had a "pure tone average of 23 [with a] [s]peech discrimination score [of] 100%."  (*Id.*)  Dr. Levine diagnosed congenital, profound hearing loss in the right ear and mild, low-frequency hearing loss on the left.  (*Id.*)

On August 24, 2004, Plaintiff saw Dr. James D. Schwender for a consultation regarding Plaintiff's low-back pain.  (Tr. 313-14.)  Plaintiff reported seeing a chiropractor since December 2001, that his back pain had increased in the six-to-eight months prior to the consultation, and that he had symptoms in both legs, knees, and ankles.  (Tr. 314.)  Dr. Schwender noted that Plaintiff walked with a slow cadence, that his lumbar range of motion was markedly restricted, that he showed a "grimacing type pain pattern with motor testing of both lower extremeties," but he did not observe any motor deficits.  (*Id.*)  Plaintiff's MRI showed a "high-intensity zone with annular tearing at L5-S1."  (*Id.*)

Dr. Schwender diagnosed Plaintiff with "[c]hronic discogenic low back pain." (*Id.*) He explained that Plaintiff had no surgical options and recommended that Plaintiff undergo a pain-management program. (*Id.*)

On September 29, 2004, Plaintiff saw Dr. Allen J. Aksamit, Jr., for a second opinion regarding neurological issues with Plaintiff's pain in his upper extremities. (Tr. 354-56.) Plaintiff reported numbness in his hands, numbness in his feet, tinnitus in his right ear, and low-back pain. (Tr. 354.) After conducting a neurological examination, Dr. Askamit concluded that there were "not neurological signs to accompany the upper extremity symptoms." (Tr. 355.) He recommended further tests to confirm the nature of Plaintiff's symptoms in his hands. (*Id.*) Dr. Aksamit also concluded that there was "no neurological accompaniment to the numbness involving the feet," but that he did have "mechanical low back pain." (*Id.*) He observed no signs of neuropathy, radiculopathy, myelopathy, or other neurological disorder. (*Id.*) On October 6, 2004, Plaintiff underwent several follow-up tests based on Dr. Aksamit's review. An EMG test revealed that Plaintiff had "no neurophysiologic evidence for a right lower trunk brachial plexopathy[.]" (Tr. 363.) This test also showed that some early or mild peripheral neuropathy and possible mild ulnar neuropathy at the left wrist. (*Id.*) An arterial study also showed no evidence that Plaintiff had an arterial disease. (Tr. 361.)

In September 2004, Plaintiff went to MAPS Pain Clinic in Minneapolis to get started on a pain-management program. (Tr. 520-27.) Plaintiff explained

that he had bilateral, lumbar back pain, and lower and upper extremity pain. (Tr. 520.)  Clinical Nurse Practitioner Lisa A. Finley, and Dr. David O. Nelson, prepared a report regarding Plaintiff's pain symptoms in which they concluded that "[t]he etiology for [his] lumbar back pain may be discogenic or related to nerve root irritation.  The etiology of [his] upper extremity pain may be neuropathic, discogenic or related to nerve root irritation."  (Tr. 526.)  Nurse Finley and Dr. Nelson discussed "medication management, invasive pain management options, physical therapy, and risks and benefits of opioids" with Plaintiff.  (Tr. 527.)

In December 2004, Plaintiff entered the MAPS Chronic Pain Program to address many of his complaints.  (*See* Tr. 515, 519.)  Plaintiff completed the four-week pain program with only one absence.  (Tr. 503.)  The Chronic Pain Program staff indicated that Plaintiff's willingness to acknowledge a need to change and maintain motivation to change was low and discussed such concerns with Plaintiff.  (*Id.*)  Plaintiff did not agree with the concerns and insisted that he had offered maximum effort in the program.  (*Id.*)  Plaintiff reported that "overall" he felt the program was helpful.  (*Id.*)  Dr. Murray J. McAllister noted that Plaintiff made progress in lumbar strength, arm and leg flexibility, and trunk flexion, but also indicated that Plaintiff had lost cervical flexibility and grip strength, which program staff indicated was due to a lack of effort.  (*Id.*)  Plaintiff was able to wean from his use of vicodin, and program staff recommended that he continue this practice.  (Tr. 504.)  Staff further recommended that Plaintiff

continue stress management and relaxation exercises and that he continue to consider the impact of psychosocial stressors on his experience of pain and perceived disability.  (*Id.*)

In July 2004, Dr. Charles T. Grant assessed Plaintiff's RFC.  (Tr. 469-76.) Dr. Grant's assessment indicated that Plaintiff could occasionally lift up to 50 pounds and frequently lift and carry up to 25 pounds.  (Tr. 470.)  Dr. Grant also concluded that Plaintiff could stand or walk for a total of about six hours in an eight-hour workday with regular breaks, and Dr. Grant concluded that Plaintiff could sit with normal breaks for about six hours in an eight-hour workday as well. (*Id.*)  Dr. Grant based this assessment on Plaintiff's symptoms of chronic pain and paresthesis, and because he was aware of few or no objective findings to support such symptoms.  (Tr. 470-71.)  Dr. Grant concluded, ultimately, that Plaintiff's "symptoms exceed[ed] objective findings," but reduced the RFC to a medium workload.  (Tr. 475.)  Although Dr. Grant apparently received additional information in the first months of 2005, he concluded that such additional information would not change his assessment of Plaintiff's RFC.  (*See* Tr. 476.)

On July 18, 2005, Plaintiff saw Dr. Glenn R. Buttermann at Midwest Spine & Orthopaedics based on a referral from Dr. Van Eck for Dr. Buttermann to review Plaintiff's low-back pain and left-global-leg pain.  (Tr. 557-62.) Dr. Buttermann observed that Plaintiff had a normal stance, level shoulders and pelvis, that there was no evidence of spine deformity, and no signs of lymphadenopathy.  (Tr. 560.)  Dr. Buttermann also noted that Plaintiff had a

normal gait, "100% of normal flexion, extension, lateral bending and rotation,"
and full range of motion in his hips.  (Tr. 561.)  Dr. Buttermann diagnosed Plaintiff
with disc degeneration in the lower lumbar spine with symptoms indicating issues
at L4-5 where Plaintiff had a central disc herniation.  (*Id.*)  Following
Dr. Buttermann's recommendation that Plaintiff get a steroid injection in his L4-5
region (*Id.*), Dr. Louis C. Saeger administered the injection to Plaintiff in August
2005, and Plaintiff tolerated the procedure well.  (Tr. 552-53.)

Also in August 2005, Dr. Laurie Koch examined Plaintiff to evaluate his
claims of numbness in his upper extremities.  (Tr. 494.)  Dr. Koch noted that
Plaintiff had well muscled hands bilaterally, no sign of atrophy, slight angular
deformity in the right wrist, no obvious color change or overt swelling, no
evidence of weakness with strength testing in his biceps, triceps, wrist flexors,
wrist extensors and intrinsics, and some deltoid weakness because of shoulder
atrophy, but no obvious atrophy.  (*Id.*)  Dr. Koch observed that most avenues for
treatment had been undertaken at that time, and recommended a bone scan and
a referral to a pain clinic.  (*Id.*)  The bone scan showed no "significant asymmetric
scintigraphic abnormality" in the right hand that would suggest "reflex
sympathetic dystrophy."  (Tr. 492.)

In June 2006, Dr. Buttermann again saw Plaintiff and diagnosed a C5 to
C7 degenerative disc disease with C7 radiculopathy, for which he ordered a
nerve-root injection, and he ordered a bilateral L5-S1 joint injection to treat

Plaintiff's low-back-pain complaints.  (Tr. 532-34.)  Later that month, Plaintiff

returned for the same type of procedure.  (Tr. 530-31.)

The record also reflects that Plaintiff had some psychological impairments.

In August 2004, Plaintiff saw consultative examiner Dr. Harlan J. Gilbertson for a

mental-status examination.  (Tr. 307-12.)  Plaintiff explained that he had chronic

wrist pain, low-back pain, shoulder pain, numbness in his legs, deafness in his

right ear, and tinnitus in his left ear.  (Tr. 307.)  Plaintiff also described himself as

having "depressed mood, hyperphagia, sleep disturbance . . ., diminished

attention and concentration, suppressed memory, increased isolation,

anhedonia, and excessive guilt" from his wife's return to work, as well as feelings

of helplessness and hopelessness.  (*Id.*)  Plaintiff reported having the ability to

generally take care of daily-living activities, including washing dishes, preparing

food, cleaning, and doing yard-work.  (Tr. 309.)  Dr. Gilbertson observed that

Plaintiff met the "criteria for an Adjustment Disorder with Depressed Mood of

Mild-to-Moderate Severity."  (Tr. 311.)  Dr. Gilbertson offered the following

assessment of Plaintiff's abilities:

> [Plaintiff's] mental capacities to understand, remember and follow
> brief directions is [sic] mildly impaired.  I believe that he exhibits
> mildly impaired ability to sustain attention and concentration, but
> moderately impaired ability to simultaneously process multiple tasks.
> His ability to carry out work-life tasks with reasonable persistence
> and pace is mildly impaired given his current psychiatric condition,
> and may be further impaired by any unresolved underlying medical
> conditions.  His ability to respond to superficial and extended contact
> with co-workers and supervisors is within normal limits.  It is this
> writer's clinical opinion that [Plaintiff] would currently experience mild
> impairment in his ability to tolerate stress and pressure typically

found within an entry-level workplace setting due to his observed psychiatric conditions.

(Tr. 312.)  In addition to Dr. Gilbertson's assessment, in December 2004, Dr. McAllister at the MAPS Pain Clinic observed that Plaintiff was "distressed" and that his history of depression, anxiety, and poor anger management along with psychometric testing suggested "an interactive effect between his mental health difficulties and his abilities to cope with his chronic pain."  (Tr. 518-19.)  At that time, Plaintiff endorsed ideas "that are reflective of hopelessness, suicidal thinking and either dissociative or psychotic symptoms."  (Tr. 519.)  Thus, Dr. McAllister diagnosed Plaintiff with "Pain Disorder Associated with Both Psychological Factors and a General Medical Condition" and "Depressive Disorder, NOS."  (*Id.*)

## III.    Testimony at the Administrative Hearing

### Plaintiff's Testimony

At the January 30, 2007 hearing before the ALJ, Plaintiff testified that he was married, had an eleven-year-old child, and a granddaughter, and lived in a house.  (Tr. 779.)  Plaintiff stated that he was right-handed, and had a two-year degree in electronics (Tr. 779), but had difficulty finding a job after he finished the electronics degree.  (Tr. 781.)  Plaintiff explained that his family was surviving on his wife's income because he had not worked since April 2000, and was not receiving public assistance of any kind.  (Tr. 791.)  Plaintiff explained to the vocational expert who was present at the hearing that the electronics degree he

earned was an "associates degree," with training in electronic theory and experience building modules. (Tr. 792-93.) Plaintiff explained that he had a lab assistant help with building most of the modules. (Tr. 793.) Plaintiff also testified that the goal at the end of the training program was to find a job such as an electronic technician who worked on things like office equipment. (Tr. 795-96.)

Plaintiff explained that he injured his wrists from a ladder accident in April 2000. (Tr. 780.) He testified that he had surgeries on both wrists in April 2000, and that as time passed, he noticed pain developing in his right shoulder, leading to shoulder surgeries in September 2000. (Tr. 781.) Plaintiff also described a history of surgeries he had in the years following. (Tr. 782.)

Plaintiff explained that he was taking Vicodin, Tramadol, and Morphine for pain medications at the time of the hearing. (Tr. 784.) He stated that he was taking the Morphine for longer lasting pain, and to help wean him from Vicodin. (*Id.*) Plaintiff explained that he was taking these medications for pain in his hands, shoulders, and lower back. (Tr. 785.) Plaintiff described difficulties he had in picking up objects and buttoning a shirt due to the pain in his hands. (Tr. 786.) He explained that while in school for his electronics degree, he received accommodations for his symptoms, including being given the option of lying down in the classroom. (*Id.*)

Plaintiff explained that his back pain had worsened to the point where he rated it a nine on a one-to-ten scale. (Tr. 787.) Plaintiff explained that he had difficulty sitting for more than ten minutes at a given time, but occasionally could

sit for half an hour, and that he experiences back pain while driving.  (*Id.*)

Plaintiff also testified that he does not feel that his shoulder surgery was

successful, and that he noticed bruising on the outside of the shoulder.  (Tr. 788.)

Plaintiff explained that he has trouble concentrating that prevent him from

reading.  (Tr. 788-89.)  He explained that he did not think he could perform a job

where he was permitted to sit and stand at will and was not required to lift much

of anything for eight hours a day, five days a week.  (Tr. 789.)  Plaintiff stated that

once a week he has to spend the entire day lying down only taking breaks to go

to the bathroom.  (Tr. 789-90.)

**Vocational Expert Testimony**

William Villa, the vocational expert present at the hearing, testified

regarding whether a hypothetical person with certain impairments and limitations

on work activity proposed by the ALJ could perform available work.  The ALJ first

asked the vocational expert to assume that a person had Plaintiff's age,

educational background, and work experience, but was limited to lifting 50

pounds occasionally, 25 pounds frequently, and sitting or standing for 6 hours in

an 8-hour workday with regular breaks.  (Tr. 793.)  This hypothetical person

would also have unlimited ability to engage in pushing or pulling, but would have

Plaintiff's hearing problems of left-ear tinnitus and right-ear deafness.  (Tr. 793-

94.)  The hypothetical person would have markedly limited ability with regard to

understanding, remembering, and carrying out detailed instructions, but would

have the ability to concentrate on, understand, and remember routine or

repetitive instructions on a sustained basis.  (*Id.*)  The individual would be able to handle contact with co-workers and the general public without significant impairment, and would have reduced but adequate ability to handle routine and repetitive workplace stresses.  (Tr. 794.)[4]  The vocational expert explained that such a person could not do Plaintiff's past work, but there would be other jobs in the regional economy that such a person could do, such as an electronic inspector.  (Tr. 794-95.)

The ALJ next asked the vocational expert to assume that the same hypothetical person was only permitted to lift 20 pounds occasionally, 10 pounds frequently, and sitting or standing for 6 hours in an 8-hour workday with regular breaks.  (Tr. 795.)  The hypothetical person would further need to avoid overhead lifting, reaching with the right arm, frequent power-grasping or gripping, vigorous pushing or pulling, or use of heavy tools with either arm.  (*Id.*)  This hypothetical person would have the same hearing problems proposed in the first hypothetical, and would only engage in "low stress, routine, repetitive work, consistent with the first RFC."  (*Id.*)  The ALJ based this hypothetical question to the vocational expert on the April 15, 2001, and September 22, 2001 RFC assessed by Drs. Erik Ekstrom and Jacelyn Kawiecki.  (*See* Tr. 255-62.)  The vocational expert explained that such an individual could not do any of Plaintiff's past work, but

---

[4]     The ALJ based this hypothetical person on the RFC assessments Plaintiff received in July and December 2004.  (*See* Tr. 793.)  These assessments are found at Tr. 465-68 and Tr. 469-76.

even with the more restrictive lifting limitations, could still perform the same work

as the first hypothetical person. (Tr. 795.)

The ALJ next asked the vocational expert to consider a hypothetical

person with limitations based on the findings in Dr. Jankus's 2001 consultative

examination.[5] (Tr. 797.) Specifically, the ALJ asked the vocational expert to

consider the following summary taken from Dr. Jankus's examination:

> [A] 43-year-old male, numerous orthopedic issues, lower extremity
> mobility, mentioned some pain at knees and ankles today, may well
> be developing early degenerative arthritis, although the exam is non-
> focal today without any major limits in range of motion or wasting. In
> other words, reduction in muscle size owning to disuse. He will be
> sent today for two views of the right knee and right ankle, which I
> think will be helpful in documenting severity of degenerative
> changes. I'd recommend using those as a guide for activity
> estimates. Major issues is [sic] really more in the realm of wrists and
> hands; the right more so [sic] than the left. At the left he seemed to
> have pretty good surgical result with only some mild limits in range of
> motion. I don't know what is going on with the numb feeling he
> describes. Differential would include carpal tunnel syndrome;
> particularly the previous wrist fracture versus less likely cervical
> spine related radicular irritation. No clear radicular damage or
> peripheral nerve damage on exam at the left is appreciated. At the
> right, he does have definite restriction at the right wrist with range of
> motion in all directions and has difficulty using the hand for pinching
> and gripping today. I tried to sort out from him how much of that was
> from the pain itself in the bones versus more of a numb feeling of the
> hand; and he has a hard time separating the two. Realistically, as
> far as the upper extremities are concerned, I think his lifting and
> carrying tolerance reasonably is going to be limited in the range of 5
> to 10 pounds, with an understanding that most of that would be held
> on the left with the right used more to stabilize the object. He is not
> going to be able to tolerate prolonged forceful pinching and gripping
> at the right hand; and probably to some extent at the left as well. At
> the right shoulder he still has some persistent limits in range of

---

[5]    *See* discussion *supra* at p. 6-9.

motion and does have documented abnormality on previous MRI and surgical report. He's not going to be able to do pushing and pulling at the right upper extremity, or overhead activities on the right to any extent either. Basic light grasping and manipulating are still intact for day-to-day self care type activities, but those activities do take him longer, with the right hand particularly. He may well have difficulty keeping up in any type of rapid assembly type activities using the right hand.

(Tr. 797-98.) The vocational expert explained that such an individual could not do any of Plaintiff's past work. (Tr. 798.) The vocational expert further testified that Dr. Jankus's findings "approximates a sedentary residual functional capacity, and, it's further reduced [by the] problems with pinching and grasping." (Tr. 798-99.) The vocational expert stated that he "would not be able to come up with jobs which would be compatible with that scenario." (Tr. 799.)

IV. **The ALJ's Findings and Decision**

On March 25, 2007, following the hearing, the ALJ issued an unfavorable decision, finding that Plaintiff was not under a disability as defined by the Social Security Act and therefore denied Plaintiff's applications for disability insurance benefits and supplemental security income. (Tr. 18-33.) The ALJ followed the five-step procedure as set out in the Code of Federal Regulations. *See* 20 C.F.R. § 404.1520(a)(4). The Eighth Circuit Court of Appeals has summarized these steps as follows: (1) whether the claimant is currently engaged in "substantial gainful activity"; (2) whether the claimant suffers from a severe impairment that "significantly limits the claimant's physical or mental ability to perform basic work activities"; (3) whether the claimant's impairment "meets or

equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education and work experience)"; (4) "whether the claimant has the residual functional capacity to perform his or her past relevant work"; and (5) if the ALJ finds that the claimant is unable to perform his or her past relevant work then the burden is on the Commissioner "to prove that there are other jobs in the national economy that the claimant can perform." *Fines v. Apfel*, 149 F.3d 893, 894-95 (8th Cir. 1998).

The ALJ found that Plaintiff has not engaged in substantial gainful activity since the alleged onset date of Plaintiff's disability, April 9, 2000, therefore meeting the requirement at the first step of the disability procedure.  (Tr. 23.)  At step two of the procedure the ALJ found that Plaintiff had the following severe impairments:

> [B]ilateral fractures of the wrist, status post surgical repair, and post-traumatic arthritis; right shoulder injury, status post type II SLAP lesion repair and rotator cuff repair; right hearing loss; tinnitus; right carpal tunnel release; degenerative disc disease of the lumber and cervical spine; C7 radiculopathy; chronic pain disorder; and depressive disorder NOS.

(*Id.*)  At step three, the ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or equals one of the listed medical impairments in 20 C.F.R. Part 404, Subpart P., Appendix 1.  (Tr. 24.)

The ALJ determined that Plaintiff had the residual functional capacity ("RFC"), to lift or carry 20 pounds occasionally and 10 pounds frequently, to stand and/or walk for 6 hours in an 8-hour work day, and to sit for 6 hours in an

8-hour work day. (*Id.*) Thus, the ALJ appeared to accept the April and September 2001 RFC assessment from Drs. Erikstrom and Kawiecki over the less restrictive July 2004 and April 2005 RFC from Dr. Grant and the more restrictive evaluation from Dr. Jankus. Using the Erikstrom/Kawiecki RFC assessment, the ALJ concluded that Plaintiff would be required to avoid overhead lifting and reaching on the right and frequent power turning or gripping, vigorous pushing and pulling, and use of heavy tools bilaterally. (*Id.*) The ALJ also accounted for Plaintiff's difficulty localizing sounds due to monaural hearing, and how Plaintiff would be limited to routine, repetitive instructions and tasks in setting with low, routine work stressors. (*Id.*) In reaching his determination, the ALJ concluded that Plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that Plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely credible. (Tr. 26.)

At step four of the disability-determination procedure, the ALJ determined that Plaintiff was unable to perform any of his past relevant work. (Tr. 31.) However, at step five, based on Plaintiff's age, education, work experience, and residual functional capacity, the ALJ determined that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. (Tr. 32.) Thus, the ALJ denied Plaintiff's applications.

## DISCUSSION

**I.    Standard of Review**

Congress has prescribed the standards by which Social Security disability benefits may be awarded.  "Disability" under the Social Security Act means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  "An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

Review by this Court of the Commissioner's decision to deny disability benefits to a claimant is limited to a determination of whether the decision of the Commissioner is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Baker v. Barnhart*, 457 F.3d 882, 892 (8th Cir. 2006).  "There is a notable difference between 'substantial evidence' and 'substantial evidence on the record as whole.'"  *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987). Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quotations

omitted); *see also Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001) ("Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision.") "'Substantial evidence on the record as a whole,' . . . requires a more scrutinizing analysis." *Gavin*, 811 F.2d at 1199. "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings." *Id.* In reviewing the administrative decision, "'[t]he substantiality of the evidence must take into account whatever in the record fairly detracts from its weight.'" *Id.* (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

In reviewing the record for substantial evidence, the Court may not substitute its own opinion for that of the ALJ. *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993). The Court may not reverse the Commissioner's decision merely because evidence may exist to support the opposite conclusion. *Mitchell v. Shalala*, 25 F.3d 712, 714 (8th Cir. 1994); *see also Woolf*, 3 F.3d at 1213 (concluding that the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding.) The possibility that the Court could draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence. *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994).

The claimant bears the burden of proving his or her entitlement to disability insurance benefits and supplemental security income under the Social Security

Act.  *See* 20 C.F.R. §§ 404.1512(a), 416.912(a); *Young v. Apfel*, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000); *Thomas v. Sullivan*, 928 F.2d 255, 260 (8th Cir. 1991). Once the claimant has demonstrated that he or she cannot perform past work due to a disability, "the burden shifts to the Commissioner to prove, first that the claimant retains the residual functional capacity to do other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to do."  *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000).

## II.    Analysis of the ALJ's Decision

Plaintiff alleges two errors with the ALJ's decision.  He first argues that the ALJ erred in rejecting Dr. Jankus's opinion and wrongfully excluded from Plaintiff's RFC the limitations Dr. Jankus would have placed on his work activities.  (Doc. No. 9, Pl.'s Br. in Supp. of Mot. for Summ. J. ("Pl.'s Mem.") 5-7.) Second, Plaintiff contends that the ALJ's hypothetical to the vocational expert about an individual who could frequently lift 20 pounds and occasionally lift 10 pounds failed to incorporate Dr. Jankus's more severe lifting restrictions, and, therefore, the vocational expert's testimony based on that hypothetical was not substantial evidence supporting the ALJ's decision.  (*Id.* at 8-9.)

Plaintiff's first argument essentially contends that the ALJ erred by failing to give controlling weight to the opinion of Dr. Jankus.  This Court finds no legal error in the ALJ's decision to not give controlling weight to Dr. Jankus's opinion. First, Dr. Jankus is not Plaintiff's "treating source," and as a result, his is not an

opinion to which an ALJ can give controlling weight.  *See* 20 C.F.R.

§§ 404.1527(d)(2), 416.927(d)(2) (describing the weight to be given to medical

opinions of a treating source, which may be granted less than controlling weight if

inconsistent with other medical evidence in the record).  Essentially, the ALJ

rejected the limitations imposed by Dr. Jankus's opinion because those

limitations were inconsistent with the other medical evidence in the record.  *See*

20 C.F.R. §§ 404.1527(d)(4), 416.927(d)(4) ("Generally, the more consistent an

opinion is with the record as a whole, the more weight we will give to that

opinion.").  And a non-treating physician's assessment does not constitute

substantial evidence if it is inconsistent with other medical evidence in the record.

*See Lehnartz v. Barnhart*, 142 Fed. Appx. 939, 942 (8th Cir. 2005) ("A non-

treating physician's assessment does not alone constitute substantial evidence if

it conflicts with the assessment of a treating physician.").

　　　The Court also construes Plaintiff's argument regarding the ALJ's decision

to discount Dr. Jankus's opinion as a contention that the ALJ's determination of

Plaintiff's RFC was not supported by substantial evidence.  The ALJ reached that

conclusion because Dr. Jankus's opinion was "inconsistent with the overall

evidence of record."  (Tr. 31.)  This Court concludes that substantial evidence

supports the ALJ's decision because the evidence overall evidence in the record

is inconsistent with Dr. Jankus's opinion.  A rheumatology consultation did not

provide a clear basis for Plaintiff's symptoms and that Plaintiff's right shoulder

surgery and replacement were not accompanied by evidence of resulting

functional limitations.  Medical evidence in the record demonstrates that Plaintiff had shown improvement in his range of motion as early as July 2000 and September 2000.  There is also a finding in May 2004 that Plaintiff had no objectively identifiable neurological cause for the complaints of pain and numbness in his wrists and hands.  Bilateral hand X-rays from March 2004 showed only mild degenerative arthritis.  In August 2005, in a second opinion regarding numbness in Plaintiff's upper extremities, doctors observed that Plaintiff's hands were well muscled without evidence of atrophy, that there were no obvious color changes or overt swelling in his right wrist, and X-rays and a bone scan showed no carpal instability or asymmetric abnormality in the right wrist and hand consistent with reflex sympathetic dystrophy.  This other medical evidence provides substantial evidence to support the ALJ's decision to discount the opinion of Dr. Jankus.

There is also medical evidence in the record that is inconsistent with other portions of Dr. Jankus's opinion.  For instance, though at the time of his examination Dr. Jankus did not have X-rays of Plaintiff's knees, later X-rays of Plaintiff's knees and ankles were unremarkable.  Other evidence shows that fibromyalgia could not otherwise explain Plaintiff's claims of pain.  Dr. Jankus's comments regarding limited range of motion in Plaintiff's shoulder and inability to do overhead activities to any extent in the future are contradicted by later medical records suggesting that Plaintiff showed gains in flexibility in his arms during his stint in a pain-management program in December 2004.  There is also evidence

that Plaintiff was not fully motivated to continue in a chronic-pain-management program.

This Court also concludes that substantial evidence supports the ALJ's RFC determination. The ALJ has a duty to evaluate the medical evidence, *Casey v. Astrue*, 503 F.3d 687, 691 (8th Cir. 2007), and bears the primary responsibility for assigning weight to physician opinions to determine a claimant's residual functional capacity. *See Estes v. Barnhart*, 275 F.3d 722, 725 (8th Cir. 2002) ("It is the ALJ's function to resolve conflicts among the various treating and examining physicians.") (internal quotations omitted); *Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000) ("An ALJ bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence[.]"). Multiple RFC assessments in the record support the limitations on Plaintiff's work activities that are incorporated into the ALJ's final determination of Plaintiff's RFC. For instance, one RFC assessment, with evaluations from both April and September 2001, includes the very lifting limitations Plaintiff complains are too severe. This RFC assessment specifically bases the lifting and other limitations on Plaintiff's earlier wrist and shoulder surgeries. A later RFC assessment, with evaluations from July 2004 and April 2005, suggests that Plaintiff could lift up to 20 pounds frequently and 50 pounds occasionally, which are less severe limitations than those imposed by either the ALJ or the opinion of Dr. Jankus.

Thus, the record contains substantial evidence supporting the ALJ's adoption of an RFC with less severe lifting restrictions than those Dr. Jankus

recommended.  The ALJ weighed the conflicting medical evidence and determined that Dr. Jankus's opinion was inconsistent with the rest of Plaintiff's medical record.  The fact that a different conclusion could be drawn from the opinion of Dr. Jankus does not mean that the ALJ's decision is not supported by substantial evidence.  *See Culbertson*, 30 F.3d at 939.  Therefore, this Court concludes that the ALJ's RFC determination was supported by substantial evidence, and there was no error in the ALJ's decision to exclude Dr. Jankus's opinions from that RFC finding.

Plaintiff's second argument, which cnocerns the propriety of the ALJ's reliance on the vocational expert's testimony at the hearing, depends on the notion that the hypothetical was inaccurate for failing to include Dr. Jankus's limitations.  "A hypothetical question is properly formulated if it sets forth impairments 'supported by substantial evidence in the record and accepted as true by the ALJ.'"  *Guilliams v. Barnhart*, 393 F.3d 798, 804 (8th Cir. 2005) (quoting *Davis v. Apfel*, 239 F.3d 962, 966 (8th Cir. 2001)).  "Testimony from a [vocational expert] based on a properly-phrased hypothetical question constitutes substantial evidence."  *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996).  Because this Court finds no error in the ALJ's RFC finding, the hypothetical question was proper and the vocational expert's conclusion based on that hypothetical was proper as well.  As described above, the hypothetical was well supported by the evidence in the record including, in particular, the Erikstrom/Kawiecki RFC assessment.

# RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1.  Plaintiff's Motion for Summary Judgment (Doc. No. 8), be **DENIED**;

2.  Defendant's Motion for Summary Judgment (Doc. No. 11), be

**GRANTED**; and

3.  This case be dismissed with prejudice.


Date: November 24, 2009

 *s/ Jeffrey J. Keyes*
JEFFREY J. KEYES
United States Magistrate Judge

Under D. Minn. Loc. R. 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **December 8, 2009**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. A party may respond to the objecting party's brief within ten days after service thereof. A judge shall make a de novo determination of those portions to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.